## AFFIDAVIT

I, Scott C. Smyth, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, deposes and states:

## Introduction

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      Your affiant is a Special Agent with the Drug Enforcement Administration (DEA) in Philadelphia, Pennsylvania, assigned to the Philadelphia Division Enforcement Group 21, which investigates narcotics trafficking.

3.      Your affiant has been employed as a DEA Special Agent since July 2020.  Your affiant has received specialized training from the DEA Academy at Quantico, Virginia, in the investigation and identification of narcotics traffickers, and has participated in numerous investigations, which have led to the arrests of numerous narcotics traffickers. Your affiant has conducted physical and electronic surveillance, debriefed confidential sources, interviewed witnesses, worked with experienced federal, state, and local narcotic agents and officers, executed search warrants, and analyzed telephone toll records. Prior to joining the DEA, I worked as an Anti-Money Laundering Specialist at Digital Federal Credit Union. During my time in this role, I participated in numerous investigations into money laundering and other violations of the Bank Secrecy Act.

4.      From training and experience during my time with the DEA, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies and drug trafficking organization. I am

familiar with the clandestine manner in which cocaine, crack, heroin, marijuana, methamphetamine, and other controlled substances are manufactured, sold, distributed, and used. I am also familiar with prices, slang terminology, codes, and mechanisms used in association with the distribution and use of illicit narcotics.

5.     From experience and training, I have learned, among other things, that: (a) drug traffickers rarely, if ever, expressly refer to heroin, cocaine, cocaine base, also known as crack or crack cocaine, or other illegal drugs by name; instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use text message capable cellular phones, cellular telephones, and other communication devices to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular telephone or location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to text messaging services on cellular phones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the cell phone.

6.     Your affiant has personally participated in the investigation set forth below.  Your affiant is familiar with the facts and circumstances of the investigation through personal participation, discussions with other federal agents, interviews with witnesses involved in the investigation, and from my review of records and reports relating to the investigation.  Unless otherwise noted, wherever in this affidavit your affiant asserts that a statement was made, the information was provided by another DEA agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom your affiant or others

have spoken or whose reports your affiant has read and reviewed.  Such statements are among

many statements made by others and are stated in substance and in part unless otherwise indicated.

Because this affidavit is being submitted for the limited purpose of securing authorization for a

search, your affiant has not included details of every aspect of the investigation.  Facts not set forth

herein, or in the attached exhibits, are not being relied on to establish probable cause in this matter.

## PURPOSE OF AFFIDAVIT

7.      Your affiant submits this affidavit in support of an application for a search warrant

for the following device: one white IPhone smart phone assigned (1) IMSI 310240227194162,

assigned telephone number 445-239-9329, referred to as the SUBJECT DEVICE. This application

seeks authority to search the SUBJECT DEVICE and seize evidence of crimes against the United

States, specifically violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846 as

described in Attachment B.

8.      As set forth below, there is probable cause to believe that the SUBJECT DEVICE

has been used in the commission of crimes, including violations of Title 21, United States Code,

Sections 841(a)(1), 843, and 846 (distribution of controlled substances, the use of communication

facilities to commit a controlled substance offense, and conspiracy to commit controlled substance

offenses). Because this affidavit is submitted for the limited purpose stated above, it does not

include every fact known to me about the investigation, but only those facts establishing probable

cause to search the contents of the SUBJECT DEVICE.

## FACTS ESTABLISHING PROBABLE CAUSE

9.      The United States, including the Drug Enforcement Administration (DEA), along

with Homeland Security Investigations (HSI) and the United States Postal Inspection Service

(USPIS), began their joint investigation into Luis Miguel CRUZ-GONZALEZ, and the CRUZ-

GONZALEZ Drug Trafficking Organization ("DTO") in April 2022, regarding violations of Title

21, United States Code, Sections 841, 846, and 843 (possession with intent to distribute controlled substances, conspiracy to distribute and to possess with intent to distribute controlled substances, and use of communication facilities to facilitate narcotics trafficking).

      10.    In April 2022, CS-1[1] contacted Special Agent Eugene Giallombardo regarding drug trafficking activities of a Hispanic male the CS-1 knows as "Mike," who was subsequently identified as CRUZ-GONZALEZ.[2] The CS-1 advised that CRUZ-GONZALEZ used to fly directly to Puerto Rico and smuggle bulk quantities of cocaine back to Philadelphia, PA and the surrounding areas. The CS-1 advised that CRUZ-GONZALEZ recently stopped going to Puerto Rico on his own and now receives kilogram amounts of cocaine through the mail.[3] The CS-1 advised that CRUZ-GONZALEZ would than re-distribute the cocaine in Philadelphia, PA. At a

---

[1] The CS-1 has prior misdemeanor and felony arrests/convictions and was the subject of a recent drug trafficking investigation, and as a result, agreed to cooperate with investigators.  The CS-1 is not paid and is awaiting sentencing. The CS-1 is cooperating with the hope that the cooperation will result in a lesser sentence on the current charges.

[2] Investigators were provided a recorded FaceTime video which depicted a Hispanic male that the CS-1 identified as "Mike." Through further investigation investigators obtained a Pennsylvania driver's license photograph of CRUZ-GONZALEZ to which your affiant positively identified "Mike" as CRUZ-GONZALEZ. Furthermore, SA Giallombardo provided the CS-1 with the same driver's license photograph of CRUZ-GONZALEZ which the CS-1 also confirmed was the person the CS-1 knew as "Mike."

[3] Through your affiant's investigation, I learned of a seizure of a US Postal Parcel in Puerto Rico in June 2021, which a canine indicated had narcotics in the parcel. A federal search warrant was obtained and the package was opened. The parcel contained approximately 2.03 kilograms of a white-powdery substance, which field tested positive for cocaine. The parcel was addressed to "Luis Miguel CRUZ, 1033 W. Rockland St. Philadelphia, PA 19141," believed to be Luis Miguel CRUZ-GONZALEZ. An open source inquiry revealed that CRUZ-GONZALEZ was associated with 1033 W. Rockland St. Philadelphia, PA 19141 on or about April 20, 2021.

later time, CS-1 introduced CS-2[4] to CRUZ-GONZALEZ as an individual who is interested in purchasing controlled substances.

11.     During the course of the investigation, CS-2 conducted numerous controlled purchases from Luis CRUZ-GONZALEZ, which included purchasing bulk amounts of cocaine and crystal methamphetamine. Furthermore, CRUZ-GONZALEZ has utilized multiple cellular devices during the course of the investigation but has been most recently utilizing the SUBJECT DEVICE to further his drug trafficking activities.

## COMMUNICATIONS BETWEEN TARGET AND CS-2 OVER THE TARGET CELLULAR DEVICE ON SEPTEMBER 11, 2022

12.     On September 11, 2022, at approximately 5:41 p.m., CS-2 received a call from CRUZ-GONZALEZ on the SUBJECT DEVICE.  During the recorded call, CRUZ- GONZALEZ discussed prices for crystal methamphetamine.  The following is an excerpt from this recorded conversation:

> CRUZ-GONZALEZ: I got the glass for the car and I can give it to you for three thousand…two…
>
> CS-2:  Okay…

Based on my training and experience CRUZ-GONZALEZ explained to CS-2 that he would sell CS-2 a pound of crystal methamphetamine "glass" for $3,200 when CRUZ-GONZALEZ states "I got the glass for the car and I can give it to you for three thousand…two…"

---

[4] CS-2 was the subject of a past drug trafficking investigation, and as a result, agreed to cooperate with investigators after having been charged with drug trafficking violations in 2020 related to a significant amount of trafficked cocaine and other controlled substances. The defendant is awaiting sentencing. Your affiant has found the CS-2 to be reliable and credible. The CS-2 has assisted in numerous drug investigations, which have resulted in the seizure of bulk quantities of controlled substances, including but not limited to fentanyl, heroin crystal methamphetamine, and cocaine, as well as the seizure of firearms and other assets derived from drug trafficking. Furthermore, the information that the CS-2 has provided in such investigations has been independently corroborated. The CS-2 was not paid.

13.     Based in part on the above-described information, on September 23, 2022, Honorable Richard A. Lloret, Magistrate Judge in the Eastern District of Pennsylvania, issued a search warrant (22-mj-1458), authorizing the disclosure of GPS location for the SUBJECT DEVICE.

## UTILIZATION OF SUBJECT DEVICE TO CONDUCT CONTROLLED PURCHASE ON OCTOBER 6, 2022

14.     On or about, October 6, 2022, at the direction of agents, CS-2 arrived and met with agents and officers at a pre-determined meet location in Philadelphia, PA for the purpose of discussing a future drug transaction with CRUZ-GONZALEZ.[5] Prior to departing the neutral location, SA Giallombardo provided the CS-2 with $3,200 of DEA Official Advanced Funds (OAF).

15.     At approximately 11:40 a.m., at the direction of agents, the CS-2 made a recorded telephone call to CRUZ-GONZALEZ on the SUBJECT DEVICE. CRUZ-GONZALEZ answered and told the CS-2 he would call the CS-2 back.

16.     At approximately 12:08 p.m., the CS-2 placed a telephone call to CRUZ-GONZALEZ on the SUBJECT DEVICE. During this recorded telephone call, CRUZ-GONZALEZ agreed to meet the CS-2 in Philadelphia, PA to sell the CS-2 an amount of crystal methamphetamine later that day.

17.     At approximately 12:48 p.m., CRUZ-GONZALEZ called the CS-2 from the SUBJECT DEVICE. During this call, CRUZ-GONZALEZ stated to the CS-2, in summary, that he

---

[5] At this time, SA Eugene Giallombardo conducted a search of the CS-2 and the CS-2 vehicle for United States Currency (USC), contraband and/or firearms with negative results. At this time, the CS-2 was also provided with an audio/video recording device to utilize during the meet with CRUZ-GONZALEZ.

had to pick up the crystal methamphetamine and that they would meet to conduct the transaction at a pre-determined meet location in Philadelphia, PA.

18.     At approximately 1:13 p.m., CS-2 arrived and parked at a predetermined meet location in Philadelphia, PA.

19.     At approximately 1:14 p.m., SA Thoms observed a Lexus, bearing PA registration LGF-9384 (hereinafter referred to as the "Lexus"), arrive and park in the back alley of 1450 Creston Street.  After parking the vehicle, CRUZ-GONZALEZ and another male were observed by SA Thoms to exit the Lexus and enter into the rear door of 1450 Creston Street. At approximately 1:26 p.m., SA Thoms observed CRUZ-GONZALEZ and the male exit from the rear door of 1450 Creston Street. As they exited the rear door, SA Thoms observed the male to be carrying an object in his hand, and observed both CRUZ-GONZALEZ and the male enter into the Lexus. At this time, SA Thoms observed the Lexus to depart the area of 1450 Creston Street. Surveillance was maintained on the Lexus at this time.

20.     At approximately 1:39 p.m., SA Scanlan observed the Lexus arrive and park in the area of the pre-determined meet location.  SA Scanlan observed CRUZ-GONZALEZ exit from the passenger seat of Lexus, while carrying an object in his hand, walk towards, and enter into the passenger seat of the CS-2 vehicle.

21.     After CRUZ-GONZALEZ entered into the CS-2 vehicle, your affiant observed, while monitoring electronic video/audio equipment, CRUZ-GONZALEZ hand the CS-2 a bag with red stripes in exchange for money.

22.     At approximately 1:43 p.m., SA Scanlan observed CRUZ-GONZALEZ exit from the CS-2 vehicle and walk back and enter into the Lexus. SA Scanlan then observed the Lexus depart the area and surveillance on the Lexus was terminated.

23.     The CS-2, left and then met with law enforcement at a predetermined meet location where the CS-2 relinquished custody of the purchased crystal methamphetamine contained within a Target bag with red stripes. The substance subsequently field tested positive for the presence of methamphetamine.[6]

24.      The CS-2 advised agents that CRUZ-GONZALEZ was the person the CS-2 met with to purchase the crystal methamphetamine.

**DRUG RELATED CONVERSATION BETWEEN CRUZ-GONZALEZ AND CS-2 ON OCTOBER 17, 2022**

25.     An October 17, 2022, CS-2 made multiple phone calls to CRUZ-GONZALEZ at the direction of DEA agents. CS-2 received a return call from CRUZ-GONZALEZ from the SUBJECT DEVICE at approximately 1:46 p.m.  SA Ryan Scanlan and SA Giallombardo listened to this call live and also debriefed with the CS-2 following the call. CS-2 stated to SA Scanlan and SA Giallombardo that when CS-2 talked on the phone to CRUZ-GONZALEZ they discussed various drug prices for cocaine and crystal methamphetamine.

**EXECUTION OF SEARCH WARRANT ON OCTOBER 20, 2022 AND SEIZURE OF SUBJECT DEVICE**

26.     On October 17, 2022, the Honorable Scott W. Reid, Magistrate Judge in the Eastern District of Pennsylvania, issued a search warrant (22-mj-1643) for 3957 N 8th Street Philadelphia, PA, the identified residence of CRUZ-GONZALEZ. On October 20, 2022, members of DEA Philadelphia Group 21, HSI, USPIS, PPD, and the Philadelphia Sheriff's Office executed the search warrant. Investigators located Luis CRUZ-GONZALEZ inside of 3957 N 8th Street Philadelphia, PA and also located the SUBJECT DEVICE inside the property.

---

[6] The CS-2 also relinquished custody of the audio/video recording device to SA Costales as witnessed by SA Giallombardo.  SA Giallombardo searched the CS-2 and CS-2's vehicle for United States currency and contraband with nothing found.

CRUZ-GONZALEZ advised investigators the SUBJECT DEVICE was in fact his cellular device.

27.     Agents transported the SUBJECT DEVICE to the DEA Philadelphia Field Division where agents processed the SUBJECT DEVICE according to DEA policies and procedures.

## ARREST OF CRUZ-GONZALEZ ON OCTOBER 20, 2022

28.     In conjunction with the search of his home on October 20, 2022, CRUZ-GONZALEZ was arrested on a federal complaint and arrest warrant charging him with distributing 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), on October 6, 2022, as detailed above (22-mj-1667). CRUZ-GONZALEZ pled not guilty to this charge and has been detained pending trial.

29.     Based on the above described information, there is probable cause to believe that CRUZ-GONZALEZ utilized the SUBJECT DEVICE to further his drug trafficking activities. Furthermore, there is probable cause to believe that there is evidence that CRUZ-GONZALEZ violated Title 21, United States Code, Sections 841(a)(1), 843, and 846, within the SUBJECT DEVICE.

## SUBSCRIBER INFORMATION FOR THE SUBJECT DEVICE

30.     In response to a DEA administrative subpoena, the provider (T-Mobile) indicated that there is no listed subscriber, and there is no listed subscriber address associated to the TARGET CELLULAR DEVICE. Your affiant is aware, from training and experience, that drug traffickers commonly disassociate themselves with such devices, through various methods, with

one being to utilize "burner phones"[7] with no listed subscriber/subscriber address, in effort to avoid law enforcement detection.

## REQUEST TO SEARCH CELLULAR TELEPHONES

31.     Your affiant is aware individuals involved in drug trafficking often utilize pre-paid cellular telephones which do not maintain specific subscriber information, and/or use phones subscribed to in the name of third person, in order to mask their direct linkage to telephones utilized in furtherance of drug trafficking activities.

32.     Based on training and experience, your affiant knows drug traffickers commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their drug transactions. For example, your affiant knows that drug traffickers often store contacts lists, address books, calendars, photographs, videos, and audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their drug trafficking activities.

33.     Your affiant knows that those involved in drug trafficking communicate with associates using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. Your affiant is aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, your affiant knows those involved in drug trafficking communicate with associates using cellular telephones and tablets to send e-mails and text messages and communicate via

---

[7] Your affiant is aware that "burner phones" are phones that are purchased and have no listed subscriber, or subscriber address associated to the telephone. "Burner phones" utilize purchased minutes, rather than signed contracts through the cellular provider to operate and are often not utilized for long periods of time.

social media networking sites. By analyzing call and text communications, your affiant may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

34.     Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts.  Your affiant is aware that drug traffickers frequently list drug associates in directories, often by nickname, to avoid detection by others.  Such directories as the ones likely contained in the seized cellular telephones, are one of the few ways to verify the numbers (*i.e.*, telephones, pagers, etc.) being used by specific traffickers.

35.     In addition, your affiant knows that those involved with drug trafficking often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones.  This evidence would show associations between accomplices, *i.e.* photographs of accomplices and/or individuals common to co-conspirators. Your affiant is also aware that drug traffickers often take photographs or make videos of drugs and drug proceeds with their cellular telephones and tablets.  Based on my training and experience, those who commit these crimes often store these items on their phones in order to show to associates, and/or to upload to social media.

36.     Furthermore, based on training and experience, your affiant knows drug traffickers often use a cellular phone's Internet browser for web browsing activity related to their drug trafficking activities. Specifically, drug traffickers may use an Internet search engine to explore where banks or mail delivery services are located, or may use the Internet to make reservations for drug-related travel. In addition, your affiant knows that drug traffickers also use their cellular telephone's Internet browser to update their social networking sites in order to

communicate with co-conspirators, display drugs and drug proceeds, or to post photographs of locations where they have traveled in furtherance of their drug trafficking activities.

37.     In addition, drug traffickers sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their drug trafficking activities.  These electronic devices may also contain GPS navigation capabilities and stored information that could identify where these devices were located.

38.     Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used.  In particular, your affiant is aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN).  The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by members of the conspiracy.  In addition, your affiant is aware forensic tools may uncover information/data users have deleted which may still be able to be recovered from the device.

## ELECTRONIC DEVICES

39.     As described above and in Attachments A and B, this application seeks permission to search and seize things that the above item might contain, in whatever form they are stored.  As used herein, the term "electronic device" includes any electronic system or device capable of storing or processing data in digital form, in this case referring specifically to wireless or cellular telephones.

40.     Based on training and experience, as well as information related to me by others involved in the forensic examination of electronic/digital devices, your affiant knows data in

digital form can be stored on a variety of digital devices.  In particular, your affiant knows electronic devices, including cellular telephones used by drug traffickers and digital/computing devices, are likely to be repositories of evidence of crimes.  Your affiant knows an electronic device such as a cellular telephone may contain data that is evidence of how the electronic device was used, data that was sent and received, and other records that may indicate the nature of the offense.

41.     Furthermore, your affiant knows that electronic devices, such as cellular telephones and computers, can store information for long periods of time.  Examples of such information include text and multimedia message conversations, call history, voice mail messages, e-mails, photographs, and other data stored on the device.  Similarly, your affiant knows, from training and experience, when cellular telephones or electronic devices are used to access the internet, a browser history is also frequently stored for some period of time on the electronic device.  This information can sometimes be recovered with forensic tools.

42.     Based on my experience and training, as well as the experience and training of other agents, your affiant knows that even when a user deletes information from a device, it can sometimes be recovered with forensic tools.

43.     Based on training and experience, as well as information related by agents and others involved in the forensic examination of electronic devices, your affiant knows that searching electronic devices can be a highly technical process that requires specific expertise and specialized equipment.  There are many types of electronic devices and software programs in use today which require specialized equipment to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of electronic devices, operating systems, or software applications being searched.

44.     Furthermore, your affiant is aware that electronic data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching electronic devices can require the use of precise, scientific procedures that are designed to maintain the integrity of electronic data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on electronic devices.

45.     Also, your affiant knows from my training and experience that the volume of data stored on many electronic devices will typically be so large it will require a search of the device in a law enforcement laboratory or similar facility.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

46.     Your affiant is also aware that electronic files or remnants of such files can be recovered months or years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools.  Normally, when a person deletes a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is

unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time

47.      Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), electronic devices can contain other forms of electronic evidence as well.  In particular, records of how an electronic device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the electronic devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregated from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal

information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the electronic device was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

48.     Further, evidence of how an electronic device has been used, what it has been used for, and who has used it, may be the absence of particular data on an electronic device.  For example, to rebut a claim that the owner of an electronic device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the electronic device remotely is not present on the electronic device.  Evidence of the absence of particular data on an electronic device is not segregated from the electronic device.  Analysis of the electronic device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

49.     Searching for the evidence described in Attachment B may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time consuming manual search through unrelated materials that may be co-mingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement

searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, the DEA intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

50.     Your affiant therefore believes and asserts that a search of the electronic files and memory of the SUBJECT DEVICES will yield evidence of violations of the federal laws, including, but not limited to, disclosing the identities of persons involved in the commission of these offenses, as well as the existence and scope of the conspiracy.  Evidence of calls made by, to, and among the members of this conspiracy, in the course of the events related in this affidavit, are also expected to be disclosed by the requested search.

51.     Therefore, based on the information, facts and circumstances stated above, your affiant believes the SUBJECT DEVICES, seized by law enforcement, will provide investigators with additional information related to the ongoing investigation of Mario ESPINO and other unknowns who are involved in narcotics trafficking.  Accordingly, I respectfully request that the Court issue a warrant to search the SUBJECT DEVICES.

## SUMMARY AND CONCLUSION

52.     Based upon the foregoing facts, your affiant submits there is probable cause the fruits and/or evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846, will be found in the information stored in the SUBJECT DEVICE identified in Attachment A.  The phone has remained in the secure custody of DEA in Philadelphia, Pennsylvania, since the arrest of Luis CRUZ-GONZALEZ on October 20, 2022.

53.     Your affiant declares under penalty of perjury that the foregoing is true and

correct to the best of her knowledge and belief.

*/s Scott C. Smyth*
Scott C. Smyth
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this
17th day of November, 2022.

*/s David R. Strawbridge*
HONORABLE DAVID R. STRAWBRIDGE
United States Magistrate Judge

**<u>ATTACHMENT A</u>**
**(Property to be Searched)**

1.  One white IPhone smart phone assigned (1) **IMSI 310240227194162**, and assigned

    telephone number **445-239-9329 (SUBJECT DEVICE)**

**ATTACHMENT B**
**(Property to be Seized)**

1. All records contained in the SUBJECT DEVICE that relate to violations of the statutes

   Title 21, United States Code, Sections 841(a)(1), 843, and 846, including:

   a. lists of customers and related identifying information;

   b. information concerning the types, amounts, and prices of drugs trafficked as

      well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs, including names; addresses,

      phone numbers, or any other identifying information;

   d. any information related to the methods of trafficking in drugs;

   e. any information recording domestic and international schedule or travel; and

   f. all bank records, checks, credit card bills, account information, and other

      financial records.

2. Evidence of user attribution showing who used or owned the Subject Device at the time

   the things described in this warrant were created, edited, or deleted, such as logs,

   phonebooks, saved usernames and passwords, documents, and browsing history.

3. As used above, the terms "records" and "information" include all of the foregoing items of

   evidence in whatever form and by whatever means they may have been created or stored,

   including:

   a. Any form of computer or electronic storage (such as flash memory or other

      media that can store data) and any photographic form.

   b. All data that has been manually programmed into a GPS navigation system, as

      well as data automatically stored by the GPS navigation system, including any

      and all electronic data which can be collected, analyzed, created, displayed,

converted, stored, concealed, or transmitted, or similar computer impulses or data.

c.   Stored electronic information and communications, including telephone or address directory entries consisting of names, addresses and telephone numbers; logs of telephone numbers dialed, telephone numbers of missed calls, telephone numbers of incoming calls; schedule entries; stored memoranda; stored text messages; stored photographs; store audio; and stored video.